Alright, we have clause number 23-60167, Illumina v. Federal Trade Commission. Is the petitioner ready to proceed? You may. Thank you, Your Honor. May it please the Court, this case concerns a transaction that, if allowed, will advance the fight against cancer. Our friends at the Federal Trade Commission, we believe in seeking to block the transaction of committed three overarching errors, antitrust, core antitrust, market definitional, and constitutional. With the Court's permission, I'd like, if I may, to take each of those in turn. Regarding core antitrust, Your Honors, there are three overarching flaws in the Commission's decision. It misapplied the appropriate standard, it cherry-picked from the record, and it failed, we submit, to balance all of the competing effects of the transaction. With respect to the standard, Your Honor, we would say this. To show a violation under the Clayton Act, it is necessary to show harm with three essential elements. The harm has to be probable, it has to be substantial, and it has to be imminent. And in this case, we submit the Commission's decision is based on an allegation of harm that does none of those things. This is a vertical transaction at the end of the day. Vertical transactions do not eliminate any competitor from the marketplace. They are, by most counts, pro-competitive transactions, and that, we believe, Your Honors, to be the case here. The government's, I anticipated a question, Your Honor. I have a lot of questions already, but keep going, keep going. Well, I'll interrupt. Legally, both sides accept it's a burden-shifting framework. We both cite to the burden-shifting framework. And both cite and claim that they prevail under either the Ability and Incentive or the Brown-Chu. So this, correct? Well, the government, we don't think there is, as the government describes it, a Brown-Chu test. I think, Your Honor, there is effectively one test. But you're more, you'd accept Commissioner Wilson's approach to it? I wouldn't put it even frankly that way, Your Honor. What I would say is the statute says that in order for there to be a violation, there has to be a substantial lessening of competition. There has, it has to be substantial, it has to be probable, and it has to be imminent. And I don't believe the standard applied by our friends at the Federal Trade Commission does any of those things. So that is the core, as you say, first problem question. Is there substantial evidence to support the conclusion that there will be a lessening of anti-competitive, or an increased anti-competitive environment? There will be a substantial lessening. Substantial lessening of competition. So then we are really in the world of a very massive, but, you know, this is not a criticism. Both parties gave us a joint appendix that's not complete. In other words, for example, even just the December 13th arguments you all made in front of the FTC, I couldn't find the full transcript. It's not, you are correct, it's not complete, Your Honor. That makes it much more challenging. I assume you had more than 20 minutes in front of the FTC. I don't remember exactly how long, but it was more than 20 minutes, Your Honor. Anyway, just getting to it, if, and I know you want to dispute this, it bleeds into your second problem, but if I do think that there is a market for innovation here, a robust market of rough competitors, but you can dispute that when you get to the market point, and if I see that all those competitors do rely on a single critical input that Illumina can provide, where, why would we be able to reverse under our deferential standard when the commission pointed to real world evidence from Illumina, acknowledging that they gave price benefits, you know that point, to Grail at the outset, I'll give you three and then you can respond to them, stating that upon the merger coming into place, their customers now would be competitors, the FTC quotes from the trial as to that, and then at the time that they originally reduced their ownership, Illumina made statements like, now we've got a level playing field for all customers. Those three seem to be supportive evidence. There are documents that refer to those individual facts, if you will, Your Honor. I don't dispute the existence of those facts. What I would say to the Court is twofold. Let me deal with the factual piece first and then come back to, I think, the more substantial kind of question of what the right standard is. Factually, in order to comply with the substantial evidence test, you've got to look at the record as a whole. I think it's pretty clear you can't cherry pick the evidence, you can't disregard that, which is inconvenient, and that we submit here is exactly, even if the standard were as the government says it is, that is exactly what we believe the Commission did. It cherry picked the record, just as an example. Okay. Well, when you say just as an example, that's leaving a big implication that they did cherry pick. Can you point to the most salient fact in your favor, the ALJ did fine, so they've got to wrestle with that, I agree, and I'll ask them questions about that. What is the best example for what you stated in the reply brief, that the Commission didn't even consider crucial facts that the ALJ failed? What's the best specific example? I would start with this, Your Honor, and I think it's pretty compelling. Illumina has always owned 12 percent of this company. It had a royalty of 7 percent, and that royalty was on sales, not profits. So effectively, they always had essentially a 20-25 percent share in the company. Okay? We recognize that's different from 100 percent. Nonetheless, in the entire existence of the Grail Company and the gallery project, there is no evidence of any effort by Illumina, no foreclosure of any kind, no evidence that we foreclosed, no evidence that there was substantial foreclosure. What about the price benefits they gave to Grail? Your Honor, the price benefit to which Your Honor refers and to which counsel referred is not untrue. It was at the inception of the company when it was wholly owned. It was not a benefit critically given to disadvantage any rival in Grail. They were owned by them. They gave them a price benefit. There was no one disadvantaged. There's no evidence anybody was disadvantaged. There's no evidence anybody was substantially disadvantaged, and in fact, I think more telling still, there's not even any evidence that anybody tried to foreclose a Grail rival. This is what E.L.J. focused on. He really said the problem here is the nexus to the merger. Correct. Yeah. I think that's right. That's, okay, that's, and you don't think the Commission wrestled with that? I do not, Your Honor. So in other words, is it fair to say they were the, everyone agrees they were the single supplier, I mean, other than this Chinese company? I think in fact there are a number of other suppliers. BGI is a significant supplier. BGI is arguably the most significant. There is unquestionably upstream competition here. I think the record on that is undisputed. The Commission found it wasn't good enough. There's no question there was upstream significant competition, far greater, by the way, than the supposed entrants who are going to come into the market at some point in the future. But you're saying even if there's evidence to support their conclusion that every single one of these competitors relies on your critical input, you're saying that was true before the merger. Correct. Is that correct? That's correct, Your Honor. What I'm saying is that the government, and just to go back to the standard point, I think the government has the standard wrong. I don't dispute that they acknowledge that the test is that you have to have a reasonable probability and imminent and substantial harm. What I'm saying is that as those words were applied here, they were applied incorrectly. Effectively what the government did is it drew an inference from the fact that we have allegedly control of a critical input to say that as a result the transaction's anti-competitive. But they did look at past conduct and say you did it before, and you're saying that's untrue. I'm saying that the conduct they look at comes nowhere remotely close to the kind of thing we're talking about here. Giving a company you fully own a price advantage, but to the detriment of nobody else, isn't an act of foreclosure. That we wholly own them, of course we were going to give them an advantage. It's those advantages that got them off the ground and that got them into the marketplace in the first place. That's not foreclosure in any sense of the word. This Court's decision, Your Honors, in Mercantile, Texas, says that in order to demonstrate the reasonable probable this Court said is more than 50 percent. It's somewhere between greater than 50 percent and 100 percent. The Court isn't clear about exactly where it was. The Commission has come nowhere close to that showing. Fundamentally, their case is that if you allow this transaction to take place, Illumina will now disadvantage presently nonexistent tests. These tests don't exist. They're not in the marketplace. The theory is that we will disadvantage these nonexistent tests if and when at some point in the unknown future they come to market. And if and when those tests, if they come to market, are actually reasonable substitutes for the gallery test. Okay. Now you're, now you are moving into your second argument, right? That's a market argument. That, that, I acknowledge that bleeds a little bit into the second argument. That's true. Okay. And, and here too, I think they pointed to real world evidence to support the Commission's conclusion that these competitors not only are dependent on your input utterly, completely, but that Grail saw these competitors as interchangeable and close substitutes. So there will be a diversion problem. And the evidence I'll ask you to respond to is Grail did set up its top tier team, correct? And then it had its, what was it called? The Thrive Red Team? There's a Red Team reference. So Grail clearly thought that they were close competitors. If they're setting up teams to launch as soon as 2024, 2025. Supposedly was going to launch, according to the government's proof, in 2022, which never happened. True. But what do we, do we have to say it's clear error for the Commission to say, well, Grail itself, one of the two companies merging, is saying these are our competitors. I don't, I don't think with respect that the, the Commission's presentation of evidence comes remotely close to substantial evidence. I don't dispute that there are internal documents in which people years in advance look out and say, all right, we're in this space. Who else is out there as a competitor? And people talk in a general sense of, yeah, our competition is this person and that person. All of these people are talking with knowledge of what they're seeing in the public record. They're not talking with knowledge of the actual clinical confidential data that the other companies have. But it's both sides of the merged entity. Grail's, Grail's seeing these exact specific threats. And then we've got the Illumina CEO and left, unless the FTC, unless you'll dispute the quote, but on page 27 of their brief, they're quoting from the record that we don't fully have. Your CEO, Illumina's CEO is saying our customers will become our competitors. Yeah, I, I don't dispute, Your Honor, that there is language of that kind. What I would say is that I think the antitrust cases are relatively clear that in that lay sense, lay non-economic sense. Yes. That's not the same thing as finding reasonable substitutability. And now I, I go a little bit into the market definition point. But the government's market, since that's, I think, importantly implied by Your Honor's question, is I think violative of all three and all known rules of market definition. It violates the rule of reasonable interchangeability. It violates the hypothetical monopolist test. And it's incompatible with the brown shoe practical indicia. At the end of the day, what they're really saying is, you know, put generalized assertions aside that somebody views someone else as a competitor. That isn't really reasonable interchangeability. At the end of the day, what they're saying is there are people out there trying to bring to market a test that they hope will be successful in the fight against cancer. So what is, in your mind, the MCED market? Is it just your product? Correct. At the, at the present time, Your Honor, it is the only product that exists on the marketplace. It is the only product. We, we don't know enough about the other products to know whether they will be reasonable substitutes or not. We don't know when they're going to come. We know the functions and the features of the, of the GRAIL test, the gallery test. We know it's positive predictive value. We know it's... But it isn't, it isn't commer, yet approved for commercial use. Oh, it absolutely is usable commercially. It is not FDA approved. The test is on the market. I've taken the test. It's absolutely out there and available. The problem is it isn't available to enough people. And that's what we think this transaction will allow us to do. Bring the talents, the skills, the expertise of Illumina to bear to get the test out there to a greater number of people as soon as we can. Not so... Is your position that there cannot be a Clayton Act claim in an innovation market? No, that is not our position, Your Honor. Our position is that an R&D market is possible. But as I think the government effectively acknowledges at page 22 of their brief, the, the viability of an R&D market depends upon future substitutability. There's got to be some showing that these tests you think are coming are actually reasonable substitutes. Otherwise, you just invoke the concept of research and development and... Who would encamp that in all the tests throughout the window? I mean, we're giving deference to the Commission. It's hard for me to say that if both parties to the merger did think there was severe threats, interchangeability, diversion, we just discount that because it's lay. What's the case that says that the, the own, the statements from the parties that want to merge and create arguably the monopoly cannot be considered? What's the best... I'm not saying, I'm not saying, Your Honor, that there is no, there is a case that says it can't be considered. I'm not saying it shouldn't be considered. I'm saying you need to consider the record as a whole. And he, and what matters for substitutability is what are the functions and the feature of these products. Not generally speaking whether somebody says, hey, the competition's coming. And that's a highly technical position because, because I take it part of your argument that there's no substitutability is that your rails test looks for 50 cancers. And yet their response, at least in the footnote, the Commission accepted it was, well, the only test that proved that was on cancer patients, not asymptomatic patients. It is, it is the government's argument that in fact the gallery test only tests for seven cancers. That, that is refuted by every witness who addressed the subject, including a witness from the American Cancer Society. Regulatory bodies have recognized the GRAIL test. The GRAIL test is marketed, it's described as a 50 cancer test. No one has ever taken issue with the GRAIL test, gallery test, being a 50 cancer test. The test has cancer signal, cancer site of origin capability. No other test has anything remotely possible. Your Honor, we know what the, how this test performs. We know what its positive predictive value is. We know what its specificity is. We know what its sensitivity is. We know that it works. We know none of that about the supposed closest rivals. And the rival that they say is closest, that is the linchpin of their case, is a company they said was coming to market in 2022. 2022 has come and gone. The test isn't here. The CEO has publicly said that they don't know when they're coming to market. None of it, and they've effectively gone back to the drawing board. So we have generalized statements that there are competitors out there. Those are not the same thing as finding products to be reasonably substitutable within the meaning of the Supreme Court's decision in Brownship. That is, we submit not substitutability. I think, I see I have 39. You may, I've asked a lot of questions, but it's going to be up to the judge how much time. We'll give you two more hours. I think I can do it in that time, Your Honor. No, go ahead. You have at least five more minutes. Okay. Thank you, Your Honor. So look, my first point was that the standard that applied is the wrong standard. I don't think on the showing here, when you actually look at what these tests do, it comes remotely close to showing anything other than speculation upon speculation about what the tests will actually do. As to cherry picking the record, I made one point, which is that never in the history of the Illumina Grail company has there been any evidence of foreclosure. We're looking admittedly predictably to the future. What will happen? What's the best indication of that? What is actually in fact what did happen? And what did happen here, and it was conceded effectively by counsel at closing argument for the industry of ledgers. There is no evidence of clogging of competition here by Illumina at any point in time. And really fundamentally, Your Honor, because I see you have another question. Well, you're nice to stop. Two quick questions. Just law, because you've been focused a lot on the facts, which I greatly appreciate. Two questions about the law. The commission hasn't prevailed in recent challenges to vertical mergers, but is it true that in those cases none of them involved sort of the acquisition of the one downstream competitor by the single supplier? Or would your response be, I don't accept either description of that market? It would be. It would, Your Honor. I don't, I don't, they haven't prevailed recently. I don't think there's been any case quite like this. The idea that somehow we're a monopolist, you know, acquiring a monopolist, I think is not quite right. There's competition above. There's competition below. And I think in any case critically, the transaction changed none of that. This is a vertical transaction. We didn't increase the concentration here at all. In a minute or so I have left, you're gracious. Maybe a little more than that. So you, you ask about what other, what, what facts are that are, that are, that are significant that commission didn't pay attention. I want to mention two others. One is the open offer and the other are the efficiencies. Okay. And here, what the commission failed to do, we submit, is to balance the effects of the transaction. The statute contemplates, you look at the transaction, you see what the effects are, you balance them. If they substantially outweigh, yes, Your Honor. Big question on that. Legally, do you balance or does your rebuttal evidence, the efficiencies and the open offer, the contract, the behavioral reduction of competition, do those have to negate the competition or can they justify the anti-competition or can they just simply justify it because you're saving a lot of lives and that's got to be considered? Do you understand the difference? I think I do, Your Honor. What I'm saying is on balance, it has to be the case that the transaction is substantially anti-competitive. When everything is taken into account, there is a burden. Your efficiencies and the open offer supply contract have to counteract the anti-competitive effects. In other words, it can't be that you pointed out powerfully, perhaps, that there's just a compelling consumer benefit to get the Grail device to full market. It's got to be negating anti-competition, not justifying. It has to be the case that it prevents the anti-competitive effect from substantially lessening competition. It doesn't have to reduce the anti-competitive effect to zero. It has to just say there's not a substantial lessening of competition. And how factually did your either efficiencies or the supply contract do that when the commission points to numerous flaws in the contract, especially enforceability ones? Let me take each of those if I may in turn. So the open offer. So it is an indisputable economic fact of life that Illumina made an open offer. It wasn't just an offer. It was accepted. It's now still available for an additional four years. It has a term of 12. And it guaranteed it contractually obligated Illumina to do a lot of stuff. Give access. Ensure no price increases. In fact, ensure price decreases. Guarantee arbitration rights. Put an arbitrator in place in the event there's a problem to do whatever is necessary to restore competition. That's what the open offer did. And what the commission basically does, in my view, is two things. They say that doesn't really count because it's a remedy, and we don't pay attention to remedies until later, and only if they fully restore competition. It's more than a remedy. Whatever you want to call it, there can't be any doubt that those existing 10 supply agreements materially affect competition and the way things work in the marketplace. That was not taken into account. It was dismissed. Then what they say as a fallback here is, well, it isn't perfect. And they imagine some flaws. Right? Well, you say prices would go down 43%. How do we know they wouldn't go down in the absence of the merger by 47%? And what I would say, Your Honor, is this. The standard isn't perfection. We don't need an open offer that ensures perfectly no possible effect on competition. We need an open offer that prevents the supposed harm to competition from being such that it is substantial and imminent and probable. And they didn't undertake that analysis. The open offer simply gets dismissed as if the effects don't matter at all. And that, we think, is a legal error. That is a legal error. Exactly. And would the remedy be to remand? I think for a variety of reasons here, Your Honor, the remedy ought to be to vacate, not to remand. But it is unquestionably, I think, a legal error. There is a similar error as it relates to the efficiencies. So efficiencies are a little different from the open offer. The open offer is an economic fact of life that needed to be taken into account as part of the prime efficient case. Well, the open offer remains available to anybody who wants to take it. The supply agreements are in effect. They are in effect, Your Honor. They're in effect. They're affecting people's lives. But if it's an arbitral, a confidential arbitral experience, how would that in any way affect the reputational argument you're making? Well, that was, I think, a point made by the commission. The confidentiality wasn't to protect us, Your Honor. The confidentiality was to protect the customer. There's not a concern on a luminous part of having people know that there's an arbitration. There are audits. The arbitrator has the ability to restore competition. The powers given to the arbitrator, and I would urge the court to look at the preface to the open offer, gives the arbitrator enormous power to restore competition. What case would you point to where there's a similar contract? I don't think— I don't think there is a case that does anything remotely close to what you have. This open offer, I think, is unprecedented in the extent— But do you have case law where courts or the commission have said, that's a vital consideration? Even if you're saying this, your proof here is off the spectrum in your favor, what's the best analysis that'll tell us whether it's the government's— I think, Your Honor, the UnitedHealth case is helpful here. The AT&T case is not really an open offer in the same sense. It involved a different form of arbitration. I think the AT&T case is one of the more prominent cases relating to effectively open offers. Consent orders have been done by courts all the time. There's a Northrop Grumman orbital consent order. There's a Teva Allergan consent order, a GE— But those are going to be enforced by the commission. Those are going to be enforced. In terms of courts, there's not an enormous amount out there that address this issue. On the efficiencies, just quickly on the efficiencies, we offered here, Your Honors, what I submit is unrefuted evidence of efficiencies. Efficiencies of a number of varieties, royalty elimination, elimination of double marginalization, supply chain royalties, R&D, and I think very importantly, market access of this life-saving test. Those were effectively dismissed by the commission as just not counting. They said they weren't passed through the consumer. Those, I would submit, those things were found. Those things were said. Those things are not in any way, in our view, supported by the record. The witnesses didn't say that. My last question. On that crucial point, because it's throughout your brief, market access saving lives. Yes, sir. It is true. You described it correctly. The commission said that's not substantiated, and you're saying, yes, we did substantiate it, but they go on to say two things. The So my question is, can you point to a record place where it shows that somehow the merged company will get faster FDA approval than Grail was getting on its own, other than your own executives? Well, by your own, you mean Illumina and— Yes. I mean— Can you point to any record site? So the best record sites we have, Your Honor, I don't have the page of the brief, but the best record sites are in the table that we put in the brief. The table. Sorry for the table, but we wanted to drive home the point. I think, Your Honor, they are in the table. Oh, but can you describe any one in the table that's the best? What record support, other than your own executives, that the merged company will get faster FDA approval? That's the question. Can you do it, or are you just going to tell me it's in the table? I'm going to say something a little bit different, Your Honor. I'm not sure I'm going to do it quite to your satisfaction, but let me try this. The way I would put it is this. There is no dispute in this case that cancer screening saves lives. Nobody disputes that. Advancing the gallery test will save lives. The only question is, is Illumina going to do it? And I would submit to you, how could it possibly be the case— Is the merged company going to do it? It's got to be that the merged company— I mean the merged company. By that, I meant the merged company. The companies are merged at the moment, right? The transaction has closed. They're not integrated, but they are merged. So I think, Your Honor, the evidence here makes clear that the government itself at 2176 of the Joint Appendix issued a press release in which they said that MSED tests will save—they said millions of lives. What our data shows and what our expert analysis shows is that if you accelerate the adoption of the test, it's going to save thousands of lives. That would be a huge pro-competitive or at least, as I think of it, consumer benefit. But I'm just really wondering, where's the flaw? Where's the record support to show that the Commission said that was speculative? It's not supported by the record. What I would say, Your Honor, is that every single fact witness, every single fact witness who addressed this subject offered evidence to support that eventuality. Alex Aravinas, Francis D'Souza, experts, every single one did it. Not a single person said anything to the contrary. The boards of directors of the companies approved the transaction on the hypothesis that it would do that. And they're full of Nobel laureates and FDA commissioners, very skilled and knowledgeable people in the field. And it was effectively written off as if it was nothing. What basically the Commission's saying is, we ought to hold back grail, not let it advance, because there's a possibility that somebody one day else, someday may come along. I know I've used my time, Your Honor, so thank you for your generosity. I think you would add 10 minutes to the response time. All right, counsel. You may proceed. I've added 10 minutes to your time. I won't be using it all, but you may proceed. Thank you. Good morning, Your Honors. Anisha Desgupta for the Federal Trade Commission. This case involves a merger between Illumina, which is the sole supplier of a critical input for MSED test development, and Grail, which is an MSED test developer. Established law and substantial evidence support the Commission's findings that this merger violates Section 7 of the Clayton Act. And established law also forecloses petitioners' constitutional challenges to the Commission's structure and authority. At stake here is whether U.S. consumers will have access to only one MSED test, that's Gallery, or whether competition among multiple MSED test developers will be allowed to continue, spurring innovation that will save lives. Most of petitioners' antitrust arguments represent disputes of fact with the Commission's market definition or anti-competitive effects. As this Court has recognized, those factual findings and inferences are reviewable for substantial evidence, and the Commission laid out an ample basis for those findings. To turn first to the market definition, the relevant market here, which is research, development, and commercialization of MSED tests, my friend on the other side acknowledged that such a market can exist. The main disputes that he raised were whether there is interchangeability here, and whether competition in fact shows the existence of the market. The Supreme Court has made very clear that the boundaries of a market need to be drawn to reflect competition where competition exists, and that is in fact the case here. We have extensive third-party and party documents showing that Grail monitored competitors closely. It formed the Thrive Red Team. But any company would monitor even possible future. So I guess what I think of as the timing problem is real, especially in the absence of virtually any case law where there's been a successful challenge to a vertical merger in the innovation market. And the ALJ then looks at it all and hears all the same evidence and just says there are too many maybes. You just haven't shown by a probability this will cause harm. So my question is, am I right that virtually all the traditional metrics of harm don't exist? We can't say diminished market share because there's no market pie. We can't say, oh, look at the price data. And we can't even point to sales diversions. So the question is, what is the key metric beyond statements by each other that we're scared of them, we want to knock them out? Where do we see? Is it past conduct of Illumina? Or what would you point to as the most salient proof the Commission relied on to see any competitive effects? The Commission relied on a variety of different pieces of evidence. But to take this back to the legal framework, because I think it is important to understand why the evidence Most damning piece of evidence they relied on, rather than the theory, which I've done my best to understand. Sure. Well, first of all, there's the evidence of actual monitoring. Then there's the evidence that the actual monitoring wasn't just based on a hypothetical belief that there would be competition in the future. But Illumina recognized that there are competitors that are quite close to grail. Thrive is basically at the same stage of development as Gallery. So although petitioners made the decision to sell Gallery without FDA approval, that doesn't change the analysis that Gallery is still a product in development. It is still a product Thriving the market. But I'm asking you if we're going to accept that there can be antitrust claims in Section 7 cases brought in the innovation world. What is the best metric? Am I right that we can't look at market share, we can't look at pricing, and we can't look at sales diversions, correct? But you can look at harms to innovation and competition. And the Supreme Court has recognized that product development and competition to improve a product can be a line of commerce. And the Commission referenced in its decision cases I see. Where did the Commission say, oh, we know innovation will be suppressed, there will be this bottleneck. They'll deny the critical input. Because the ALJ was saying what I called a moment ago the nexus problem. We actually have the unique circumstance where these two companies were fully entwined before. And then they reduced Illumina reduced ownership. But does the record contain data that at that time they exercised their ability to clog up? Yes or no? Yes. Yes. Ample evidence. So for example, the Commission analyzed what the incentives were prior to the acquisition and analyzed what the incentives were after the acquisition. And my friend on the other side acknowledged there is a difference between minority stake in Grail and a 100% ownership. And the Commission found that Illumina's gross profits were through the sale of Grail's tests would far exceed anything it could lose from foreclosure. That evidence is laid out in page 256 of the record experts. I'm not going to go through it because it's sealed. But both sides had their experts. I guess I'm asking the warring experts are significant and there may be deference given to their choice of experts. But I'd love to see if there's real world evidence of price sort of predation. Did they actually harm the competitors in that earlier world? It's not just price predation as the D.C. Circuit noted in the AT&T case. Vertical mergers can cause harms to competition that don't just involve raising prices for consumers. It can be reduced product quality and reduced innovation. And here the Commission noted that when Illumina previously vertically integrated into areas where it then became a competitor to other developers in the field, it rationally acted on its financial incentives when dealing with competition. So in the example of oncology therapy selection tests, as the Commission noted in its decision, those tests, like MSED tests, are dependent on NGS. And they're dependent on the product and the support that Illumina provides. And when Illumina, after Illumina vertically integrated, when Illumina was determining what support to provide, it took into account the degree of competitive threat that particular companies posed when deciding how much support. It's separate from prenatal testing, actually. It's the therapy selection tests and it's discussed at page 259 of the record. Okay, so beyond that they took into account competitors, is there evidence that they actually disadvantaged competitors? There are strategy documents talking about cannibalization and about not wanting to support an entity that would compete with Illumina. But I think to take it back to what examples exist of actual past foreclosure, the Clayton Act itself does not require that past foreclosure has taken place. The Clayton Act speaks in terms of reasonable probabilities and it is forward-looking because the whole purpose of the Clayton Act... We don't have much we can look forward or even present. We almost have to go back into this market. Well, what we have in the present is robust competition, dependence by everyone in the market on Illumina's product and the ability of Illumina, therefore, to foreclose because it has complete control over the product and the incentive, which is shown both by just the rational financial incentives they have as a profit-maximizing company, which they pursued in the past. Well, when you say that, I mean, again, it's so important to get down to facts. They point to the experience with the Veronata device where they did a similar acquisition, they claim, and the facts suggest they lost market share. Yes? No? Well, in Veronata, there were already competitors who were selling tests. That's slightly different. Here we have a market for research, development, and commercialization where Illumina has chosen to sell Galeri, but in Veronata, there were already competitors selling tests. But even in the Veronata example, as we discuss in our brief, and I think this evidence is sealed, but we do give page numbers to the record, the commission noted that there was testimony by participants in the prenatal testing market about the ways that Illumina had sought to disadvantage them in their access to critical supplies, and there were internal strategy documents discussing that. So plaintiffs claim that the open offer changes the analysis by somehow constraining them from acting on these rational incentives, but the commission found that the open offer was full of holes, and it described that finding in detail at pages 273 to 279 of the record excerpts in its opinion, and went through all the different features of the open offer and why the open offer would not have the effect of mitigating the effects to competition in a way that would make this merger lawful under Clayton Act Section 7. The commission also thoroughly explained and supported its findings that petitioners had not demonstrated any efficiencies that were verifiable, merger-specific, and would be found that the petitioners had not established the existence of the market and regulatory acceleration efficiencies on which they based their claims of lives saved, and although my friend on the other side has said that the testimony on that was unrefuted, even petitioners' own medical experts testified that competition, more test developers will spur innovation, which will lead to better tests, and the commission noted that this evidence exists and it supports the basic policy determination that Congress made in the Clayton Act, which is that it is competition and innovation that will create the best outcomes for consumers, and here outcomes mean more tests, better tests, and therefore more lives saved, and these are all findings that the commission laid out and it documented in the record. If the court would like, I can provide the specific citations to Your position is legally the commission did or didn't assess their open offer in particular, but I tend to group that with the other efficiencies they point to. At the rebuttal stage, as distinct from somehow carving it off from the whole analysis and saying this just goes to remedy? Correct, and the commission says that expressly. It discusses why the open offer has characteristics that are more on the order of characteristics of the remedy, but it did consider the open offer at the rebuttal stage, and it considered whether the open offer would have the effect of making the merger lawful under the Clayton Act, and it concluded that petitioners had not shown that the open offer would address the different ways in which Illumina could foreclose competition. There are numerous aspects of this record that seem to be unique, but it is true that previously, prior to 100 percent ownership, they had multiple competing customers all using their platform, and now they're saying even after the merger, we've got this guarantee, 12-year guarantee. We'll do the same. Is the commission's answer really we just think that's imperfect, it's flawed, or is it not part of the analysis? The commission did take that into account in the analysis, and the commission noted that the open offer doesn't fully address the kinds of scenarios that could arise, and the commission also noted that even test developers who sign the open offer because they need access to Illumina's products to continue their work, even they testified that the open offer didn't fully address their concerns with the merger. I mean, the open offer just goes to show petitioners' recognition that Illumina's product is crucial for MSED test development. It doesn't actually address Illumina's ability to foreclose, and my friend on the other side said that Illumina had the ability before, and it had some incentive before, and that's true, but what matters here is that the merger significantly changed the incentive. The ability existed before, but the merger significantly changed the incentive, and that's sufficient because the ALJ in this case said you have to have both an increase in ability and an increase in incentive, but that would basically carve out of the Clayton Act any situation like this where you have a merger where one party has a monopoly on the supply of a product, and the commission laid out all of that in its decision. The petitioners offer their table and various citations that they say demonstrate that the or that they presented evidence that was somehow unrefuted. Those arguments are factually wrong. I can offer a few examples if that would help the court of instances where they reference record evidence that the commission did take into account, but what the takeaway is from the commission's decision here is that the commission did not cherry pick the record as petitioners have alleged. In every instance where there was a conflict in the evidence and especially where the commission concluded that the ALJ had made an error of fact or an error of law, the commission's decision addresses that head on, and the commission explains why it finds persuasive evidence that it does and why it concludes that certain contrary or conflicting evidence was not persuasive, and that satisfies the substantial evidence standard of review here. There isn't much case law, certainly non-favorable to you recently in the vertical merger context. Is it easy to suggest to tell why, as to the United Health and AT&T, those cases don't point to infirmities in the position of the FTC here? Yes. In AT&T, the district court there found that because of the dynamics of the market in play, that merger was not actually going to increase the ability or incentive of the merged entity to foreclose competition because it was not going to make it more likely that these blackouts would take place, and therefore, there wasn't going to be much change in the bargaining position. Here, the commission modeled why there would be a difference, and it substantiated its conclusion. Modeling? Yes. I guess I'm still struggling with the substantiation. It has to forecast in the future where Grail's product's the only one out there right now. I guess I have two questions. Do you have a limiting principle so that you wouldn't be able to say there's close to a per se vertical merger or Clayton Act violation every time we've got an upstream company that's perceived as dominant or has a critical input? Would that, therefore, always create a Section 7 problem? By no means. The commission is not pressing here some per se argument that vertical mergers are illegal. What we have here are a few special factors. First, we have the fact that there is one company that controls a critical input. That is not going to be the case in every single vertical merger. Second, we have a— —that you don't prevail. If they—that Merged Energy later refuses to deal, there would be Sherman Act exposure to it then. If it has this essential facility, essential technology, they're going to be exposed. Yes, but that would be too late, Your Honor. The reason why Congress enacted the Clayton Act was that it found that by the time something gets to be a full-blown Sherman Act violation, it might be impossible for any remedy to remedy the harms that occurred to the public. And that's particularly true when you have a product market like this that's characterized by rapid technological change and a long regulatory process. By the time, at the end of the day, a violation of the Sherman Act occurs and a court remedies it, other test developers may have been unable to continue with their products and the product market, the public will be harmed. For example, in the AT&T case, if you already have a mature enough market to say, oh, we've looked at the dynamics, it's going to be bad for the competitors. Here we just don't know. So when you emphasize it's a market that involves rapid technological change, we just don't know in two years whether all these tests will be obsolete. The sequencer they're using is just not even going to—it'll be leapfrogged by some other technology. Well, we do know that we have here at least one test that is very, very close to Gallery in terms of where it is in the regulatory process, that it's a test that on the target population has been shown to detect eight cancers to Gallery's seven, and that it is competing with Gallery to reach the goalpost of FDA approval, which is what all of these tests need in order to have widespread commercial acceptance. And we also have in the— I mean, at the end of the day, what we're talking about here is a prediction. And that is what the Clayton Act contemplates, and that's what— Exactly. It says reasonable probabilities. Correct. So it allows that you can make a prediction. Correct. So what happens is Illumina's rational financial incentives and its past action on those financial incentives and testimony showing how that would be possible without incurring the reputational harm that Illumina argues would be a check. So for example, Illumina offered as a main reason why it would not degrade these services, that it would harm its reputation, but none of its customers have anyone else to turn to. And the kind of degradation of services that we're discussing can be very subtle. So it can involve— So there are no examples that have actually occurred of degradation in service that were documented at the trial, because the trial took place shortly after the acquisition closed, and the terms of the open offer were still being modified at that point. And what the trial evidence showed, though, is that even Illumina's executives, when examined on the terms of the open offer, agreed that projecting into the future, it is not possible to anticipate the kinds of circumstances that would arise. And the Commission laid out the different ways in which Illumina could foreclose competition, and it addressed how the open offer would not mitigate those different ways of foreclosure. And that amounts to a sufficient probability when taken into account of the record as a whole. So again, when we have the ability, and we have the incentive, and we have the showing that the downside risks that Illumina claimed would constrain it will not actually constrain it in fact, that's a sufficient, reasonable probability for Clayton Act analysis. A possibility would be speculation, but here, everything the Commission said, it anchored in the record, it anchored in documentary evidence, it anchored in testimony, and it So all of that amounts to the reasonable probability here. Does your argument either about ability, incentive, or Brown-Shu factors depend on any showing of bad faith, either in the past or in the inexorable future? Not at all. There doesn't have to be anything. There is no evidence of that type of collusive bad faith in this case, correct? It's not about bad faith, Your Honor. It's about the fact that we have. I asked you, is there any evidence of it? Of collusive bad faith, no, but there is evidence of financial incentives, and there's evidence of companies rationally acting on their own financial incentives, both Grail and both Illumina. Let's assume you're right, that it has to be a showing of a substantially likely, no, a likely substantial lessening of competition, isn't that the statutory language? Mm-hmm. We are sort of in a hypothetical world, which is, I don't mean just to loop back to questions we've asked both sides already, but if given deference, there is evidence to support that, either from the modeling or from past conduct, then the burden shifts, and they claim they've offered pro-competition evidence, either from their past conduct when they lost market share. My question to you is, in that, when they had the burden, they do show, and I think it seems apparent, that there's a huge consumer benefit in expanding the only existing access to a test now. Would your answer to me be, that's not part of the equation? We focus just on price and innovation, which will go down? Or is it part of the analysis to acknowledge, right now there's one product that we should encourage to maximum marketing? You see the question? I do see the question, and I think that it's, the premise of the question looks to the fact that they chose to offer gallery to sale, for sale. Exact Thrive could have offered its own product for sale in the same way, rather than proceeding through other steps of the regulatory process. This is laid out in the record, but what the commission was analyzing here, and it's what merger specificity and verifiability look to, is whether petitioners have actually shown that this is going to be the best way of accelerating the test, and this is going to be the best way to bring a better product to consumers. And the commission concluded that the evidence did not show that, because petitioners were unable to show anything that they could do that would accelerate the acceptance of the test, or the regulatory approvals for the test. There was no showing that anything that they claimed was part of this particular merger. Justification. In your reply brief on page 48, you did suggest that a company, a merge company, could justify effects that were anti-competitive. They didn't have to negate. It could be just a terrific benefit that justifies it. There is a weighing analysis, because the touchstone is the language of the Clayton Act, which is maybe to substantially lessen competition, so there may be certain kinds of efficiencies that would have pro-competitive effects that, when taken against other anti-competitive effects of the merger, could show that the merger is, in fact, not substantially lessening competition. And the commission specifically considered that question with respect to petitioners' claim deficiencies, and showed that they hadn't even passed through the gate of demonstrating that those claim deficiencies were merger-specific or verifiable. Nothing about the commission's decision here prevents petitioners from going forward with their research and development and commercialization of Gallery. They can continue to bring Gallery to the market, to seek FDA approval. What they can't do is kneecap competition in the process. There's nothing about the commission's decision that seeks to constrain Grail from anything it does with respect to Gallery. It's just that by continuing to allow other MSED developers access to Illumina's products, that will enable that competition and innovation to continue. Just evidence of a likelihood that this merged company will kneecap competition is what? Is it sort of logic and Miss Fiona Scott Morton? Just this is what any company in their position would do? Or do we have any evidence that this merged company would kneecap competition? We have the evidence of the ways that both parties to the merger acted when confronted with competition in the past. That both of them, when confronted with competition in the past, sought to develop strategies to thwart that competition, to further their own position. The strongest evidence of that is what? As particular as you can be. Well there is Grail's competitive strategies document, which goes through what all of the different competitors to Grail are doing. There's the creation of the Thrive Red team on the Grail side, and the discussion of the different strategies that Grail could pursue. Aware of competition in the market, but again, anything suggests he would do it. And on the Illumina side, we have the prior vertical merger into oncology therapy selection. And there, again, Illumina is taking into account where its incentives lay and how they could act on those. And then in the prenatal test example, there was testimony of actual past conduct that had occurred. But... Are the draft merger guidelines that are just, that are notice and comments finishing, anything relevant to that? The merger guidelines are not binding on the parties or the courts here. And the merger, the draft merger guidelines are still up for notice and comment at the moment. So... It would illuminate our analysis, given the paucity of case law. The draft merger guidelines are still at the, at an intermediate stage. They're not finalized. There will be notice and comments. So I don't... Yeah. Thank you. Thank you, Counsel. Rebuttal. Thank you, Your Honor. Your Honors ask about the most salient facts of, of I think kneecapping was the term most recently used. And I think what Counsel said, Your Honors, is simply that there were grail documents talking generally about monitoring competition. That's not kneecapping. That's basic competitive intelligence that reflects nothing pro or anti-competitive. Probably pro-competitive would be monitoring what the competition's doing. And then what Counsel said is that with respect to Illumina, there were two things. She said these, the, the therapy selection merger. There was no therapy selection merger. The only vertical transaction that Illumina has ever done concerns a company called, that's in this record, concerns Veronata. And here, while to be sure, suggestions have been made that Illumina wasn't as nice as it might have been, there is absolutely no evidence whatever to suggest that transaction was anti-competitive. And in fact, the evidence demonstrates exactly the opposite. Output was up. Prices were down. The market expanded. Market share was lost by the Veronata company. Yes, that's exactly what the record here is. Who, who made that? I think the. Did the ALJ rely on that and did the FTC address that? The FTC did not, the FTC did not grapple with that. The ALJ, I frankly don't remember, Your Honor, whether the ALJ specifically mentioned that. But it's. It's fairly salient. Well, it is salient. The ALJ found, remember, the ALJ found there was no anti-competitive. I know that. I'm just, I think that, again, the record's enormous and it's partial. So, I was startled that there wasn't much attention by either adjudicatory body to your Veronata example. The FTC does quote a competitor that says they weren't, it didn't go well, but then you're, you suggested that you actually lost market share. That's a big point. I, it is a big point and it is in the record and I think the, the idea that that's the best evidence of kneecapping and of anti-competitive effect is telling. Because there is no evidence, it's exactly the opposite. That transaction was the model of pro-competitive effect. I appreciated you said in your principle argument, you do acknowledge there could be a market in innovation. Oh, sure. So, if in this case, you just say that market either doesn't exist or the, the proof wasn't sufficient, what would be the metrics that one would assess a section seven violation in those markets? What would you tell us is the principle metric to measure harm in that type of market? Well, I think if you're saying there's, you're talking about an R&D innovation market that supposedly existed. Again, we don't think. I know you don't think it exists here. Assuming. Since you recognize that it could exist, what would be the metric? Well, I think the simplest way to put it this way, Ryan, is according to the government, it does exist. There is an R&D market. So, we can look at what's actually happening today and we can look at what has happened over the last eight years when Illumina has owned Grail in this R&D market. What's actually happened? They refer to their being. I very much appreciate that's this case. But, and I appreciate your arguing for your client and I think the ALJ. You're talking about as a general matter. As a general matter, because I listed the metrics that most courts use, they don't exist here. I'm just struggling with what would they use? Well, and I didn't say it very artfully, but let me put it this way. As to the market as they've defined it, right? They say there is today an existing R&D market. Well, those metrics do exist in such a market. Research and development has been going on for years in this marketplace. Where's the harm to competition? They say the market exists. They say Thrive is basically knocking at the door, knocking to get in. That R&D that they talk about, that's been going on for years, right? But then, but of course, 12% or 20 to now 100%, the screws will tighten. Oh, sure. But I'm making a, I mean, let me make two points here. My point, my initial point is a little bit different from that. They're saying that the existing market is an R&D market. There's data as to that market. We know who the people out there. They've identified them that they say are supposedly coming. Where's the evidence? Lost investment, reduced technological. Where's the evidence? Sure. And where's the evidence of that? Nowhere. They've got actual R&D competition out there. Instead, we have just the opposite. They've referred to Thrive several times. What actually happened here in the real world is that Illumina announced this transaction. The transaction they say is going to scare everybody off and harm competition. What happens? Thrive announces that it's going to buy Exact. The market reaction to this transaction, what the analysts said, what actually happened in the R&D world is that the money came pouring in because the belief was then and is now that it will expand the marketplace. If we can get this test on the market, getting more people taking the test, it's going to expand the market. And it's why it makes no sense to say that Illumina is going to shoot Exact. Very good. The effect of whether we grant or deny, what's the status of the appeal in the European Union? So there are, it's complicated there.  The key appeal is a jurisdictional appeal, Your Honor. That's underway. We're hopeful and expecting a decision later this year, early next year. That's the key appeal. Do you agree that the draft guidelines that notice and comment finish in a week or two give us no insight into how we would analyze it? I think the new ones give you no insight. I think what should give you insight is the fact that the guidelines were pulled, right? The existing merger guidelines were pulled during the course of this trial, shortly after it was undertaken. They were what? They were pulled. The vertical merger guns were withdrawn. I think that should tell you something about the government's shifting position as to how to deal with things like efficiencies. I think my time has expired. I agree. Thank you, Counsel. Thank you, Your Honor. The court will take this matter under advisement. We are adjourned.